**In re Jodi Leigh PROYECT, Debtor.**

**Fredrik Sherman, Plaintiff,**

v.

**Jodi Leigh Proyect, Defendant.**

**Bankruptcy No. 12–81457–JRS.
Adversary No. 13–05121–JRS.**

United States Bankruptcy Court,
N.D. Georgia,
Atlanta Division.

Dec. 11, 2013.

---

29. Adv. Doc. No. 63.

30. Adv. Doc. No. 41.

31. Adv. Doc. No. 68.

James O. Bass, Bass Bergeron & Smith, PC, Woodstock, GA, for Plaintiff.

Roger K. Ghai, Law Offices Of Roger Ghai, P.C., Kennesaw, GA, for Defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

JAMES R. SACCA, Bankruptcy Judge.

Divorce, business failure, bankruptcy: all involve chapters drawing to a close, with fresh starts to follow. Many of us are fortunate enough to avoid these bitter-sweet—and sometimes just bitter—new beginnings. But the unfortunate ex-spouses who are the Plaintiff and Defendant in this adversary proceeding experienced all three in short order. And now they find themselves embroiled in bitter litigation that hampers their ability to move on with their lives. The crux of the dispute in this adversary proceeding revolves around the ex-wife's disposition of business assets, her liability on business debts, and the ex-husband's decision to withhold child support to cover certain of those liabilities. The primary questions before the Court

are whether certain of the ex-husband's claims against the ex-wife are nondischargeable pursuant to 11 U.S.C. § 523(a)(2) or § 523(a)(15), whether she breached a fiduciary duty to him, and whether the ex-husband violated the automatic stay by withholding a portion of his child support payments. The Court conducted a trial regarding these disputes on November 18, 2013, and now enters these findings of fact and conclusions of law.

### Factual Background

Mr. Sherman and Ms. Proyect were married in 1999 and had two children. They also went into business together, purchasing a day spa in 2010 that would operate under the name LaBella Spa and Salon (the "Spa"). The Spa offered services such as facials, massages, hair, nails, makeup, and microderm abrasion. Officially, the Spa was owned by Wonderful Tonight, Inc. (the "Company"). The evidence at trial did not clarify the ownership structure of the Company. In fact, Ms. Proyect was unsure whether she even had an ownership interest in the Company at all because Mr. Sherman "handled all that stuff," and she claimed that he would not produce the corporate records to her so she could determine her interest, nor were they produced at trial. Both parties guaranteed certain obligations on behalf of the Company to finance the Spa, including a lease agreement (the "Lease") with a company owned by Billy Schultz (the "Landlord") for the commercial space in which the Spa operated and an SBA-guaranteed loan from Barrego Springs Bank (the "SBA Loan") in order to finance operations.

Originally, Mr. Sherman operated the Spa. He managed the Spa for about a year—from September 2010 until September 2011. During that period, he paid himself a salary of about $2,000 monthly, and Ms. Proyect worked nights and weekends at the Spa (while working a fulltime day job) but received no salary for these services. In September 2011, Mr. Sherman secured full-time employment, and Ms. Proyect left her full-time job and took over managing the Spa's operations. According to her, he "walked away from" the Spa, and his involvement in its operations ended at that point.

A few months later, their tenuous marriage reached the breaking point. After thirteen years of marriage, they separated on January 16, 2012. Shortly thereafter, Mr. Sherman used money from an inheritance to pay off $42,500 off debt on their joint Bank of America MasterCard (the "MasterCard") and told her that she "wasn't going to go anywhere." Mr. Sherman did not want to move out of their marital home, so Ms. Proyect moved into an apartment.

Ms. Proyect filed for divorce in early February 2012. Shortly thereafter, Mr. Sherman canceled all of the credit cards and closed their bank accounts, which she claims left her with only $12.28 in cash, no credit cards, and no income, since she had quit her full-time job and had not been drawing a salary from the Spa. Consequently, she then began paying herself a $700 weekly salary in February 2012 for managing the Spa, often drawing only a partial payment and then collecting the remainder when cash flow permitted. According to Ms. Proyect, Mr. Sherman continued to draw a salary from the Spa, even though he no longer participated in its operations, but he omitted his salary and car allowance from the financial statements he prepared and offered at trial. She also testified that both of them commonly paid personal expenses out of business accounts and that these expenses were omitted from the financial statements as well.

At the time of the divorce filing, the Spa was teetering on insolvency. In early February 2012, Ms. Proyect ran a charge at the Spa for $2,000 on the MasterCard (the "Charge"), to inject cash into the Company. Ms. Proyect testified that she believed it was a company card at the time of the Charge, but later realized she was wrong. She says that the money went toward paying business expenses because the Company was out of cash at that time. Mr. Sherman later took out a criminal warrant against her based on the Charge, but it is unclear what came of this warrant, if anything.

In May 2012, the couple went to mediation in their divorce proceeding, at which time the Spa was still operating. At the mediation, Mr. Sherman accepted liability for the debt on the MasterCard, including the amount owed due to the Charge. They reached an agreement in principle that would form the basis for many of the issues in their final divorce settlement. The couple stipulated at that time that Mr. Sherman was earning about $80,000 annually, whereas Ms. Proyect was entitled to earn about $35,000 annually from the Spa, although the cash flow was not necessarily there to pay her.

By early June 2012, the Spa was out of money and could not continue to operate. Ms. Proyect informed Mr. Sherman that the Company's bank accounts were in the red and that she had decided to close the Spa, to which he did not object. Unable to pay the workers, she instead gave them spa equipment and products in lieu of cash. She arranged for some of the assets to be sold on consignment. She did not provide a list of assets sold, but she testified that all of the proceeds went toward business expenses. She did produce receipts from the workers generally showing that inventory and equipment was transferred in lieu of payment. Mr. Sherman also took some of the Spa's assets. He sold some of these assets and provided her a list, and he indicated that he had reimbursed himself for business expenses incurred relating to shutting down the Spa.[1] He still had some of these assets at the time of trial, which remained unsold.

Ms. Proyect also took home one of two computers from the reception area of the Spa and testified that she chose to take "the one that looked prettier," and Mr. Sherman took the other one. She later reformatted the hard drive of this computer, having been informed that it was infected with spyware. Mr. Sherman has accused her of destroying the business records on that computer. She testified that she believed the other computer contained a "mirror image" of those records. Mr. Sherman contends that the computer she took was the server and the other—which he took for himself—was the client and contained no business data.

On November 7, 2012, the couple's divorce was finalized. The Superior Court of Paulding County, Georgia entered a Final Judgment and Decree of Divorce (the "Divorce Decree"), which incorporated a Settlement Agreement, also dated November 7, 2012 (the "Settlement Agreement"). Pursuant to the Settlement Agreement, Mr. Sherman retained their marital home, along with the liability on its mortgage, and was required to sell the home and pay Ms. Proyect $5,000 to cover her moving expenses. They agreed on a division of personal property, with each of them taking one of their two automobiles along with the associated debt, and they agreed to

---

1. According to an email he sent to Ms. Proyect, Mr. Sherman reimbursed himself $175 out of liquidated asset money for expenses to clean out the commercial space the Spa occupied. Def's Ex. J.

indemnify and hold each other harmless for any costs stemming from the other's vehicle. Both parties agreed to waive any claim to the other's bank accounts, as well as retirement accounts, pensions, or IRAs. They also waived any claim to alimony. Each party agreed to be liable for all individual debts held in his or her own name, and Mr. Sherman specifically agreed to be responsible for their debt on the MasterCard (including the Charge).

The Settlement Agreement also contained provisions relating to the Company's assets and liabilities. The parties were to provide written documentation of any sale of the Spa's assets—the majority of which had already been sold by the time the Superior Court entered the Divorce Decree—and apply any proceeds toward the SBA Loan and/or the Lease. Under the Settlement Agreement, they would each be responsible for 50% of any remaining debt on the SBA Loan or the Lease.[2] Unlike the section of the Settlement Agreement pertaining to their automobiles, the section regarding the assets and liabilities of the Company contained no indemnity or "hold harmless" language.[3]

On December 22, 2012—a little more than a month after entry of the Divorce Decree—Ms. Proyect filed for protection under Chapter 7 of the Bankruptcy Code, thus commencing the underlying case. She testified that she is currently unemployed and now lives in Florida with her parents and her two children. She further testified that she applied for Medicaid and receives food stamps,[4] and that her parents give her money each month to help cover her living expenses.

Not long after the Spa closed, the Company found itself in default on the Lease, and the Landlord sued both Mr. Sherman and Ms. Proyect based on their personal guaranties. Mr. Sherman negotiated with the Landlord, who apparently was willing to accept $12,000 to settle the remaining liability under the Lease in lieu of the $28,000 balance due. Mr. Sherman communicated this offer to Ms. Proyect, but she did not respond. The Landlord then obtained a state court judgment for the $28,000 balance owed. Mr. Sherman continued negotiating with the Landlord and on June 10, 2013 convinced him to accept $18,000 in lieu of the judgment, in the form of $3,000 down and $1,000 monthly for 15 months (the "Lease Settlement"). Ms. Proyect neither agreed to nor objected to the Lease Settlement. Mr. Sherman testified that he actually made an early payment in May 2013 to show good faith so that the Landlord would negotiate with him.

Pursuant to the Divorce Decree, Mr. Sherman is required to pay Ms. Proyect $1,286 monthly for child support. Beginning in May 2013, he started deducting money from the child support payments to offset Ms. Proyect's share of the Lease Settlement. After the first such deduction, her lawyer sent his lawyer a letter asserting that these deductions were a violation of the automatic stay and demanding that he cease all collection attempts immediately. Undeterred, Mr. Sherman again deducted money from the child support

---

2. Also, under the Settlement Agreement, Mr. Sherman was entitled to deduct all of the business losses associated with the Company for tax purposes.

3. The Settlement Agreement did contain a blanket provision in another section providing that each party would hold each other harmless for any liabilities incurred individually or jointly with a third party—but this section is silent regarding business debts or personal debts that the two of them incurred jointly.

4. Schedule I in Ms. Proyect's underlying bankruptcy case indicates she receives $302 monthly in food stamps.

payments in June and July. Following a custody hearing related to their divorce case in July 2013, he resumed making full child support payments, but he did not repay the previously deducted amounts. He then sent her an email telling her that she would need to pay half of the amount owed under the Lease Settlement and provided the Landlord's address for payment purposes. He is now only paying the Landlord $500 per month—half of the agreed—upon amount. The Landlord has asserted that he is now in default of the Lease Settlement.

Mr. Sherman commenced this adversary proceeding by filing a Complaint on March 25, 2013. [Doc. 1]. In his Complaint, he alleges that Ms. Proyect owes him money relating to the Charge and her liquidation of the Spa's assets and that these debts to him are nondischargeable because she committed fraud and breached her fiduciary duty to him by not maximizing the sale of the Spa's assets, by failing to use the proceeds to pay their joint business debt, and by failing to maintain or by destroying records of the disposition of those assets and their proceeds. In addition to actual damages for the amount of the Charge and the value of assets disposed of, he seeks damages for attorney fees and additional costs he incurred because she did not agree to settle their obligations under the Lease for $12,000, as well as punitive damages for her alleged breach of duty. He further alleges that her obligations to pay 50% of amounts owed on the SBA Loan and the Lease are nondischargeable under § 523(a)(15) because they were incurred in connection with a divorce proceeding. He later filed a motion to amend his Complaint [Doc. 7], which was granted [Doc. 15]. The Amended Complaint effectively added a claim for nondischargeability under § 523(a)(5), which applies to domestic support obligations.

Ms. Proyect filed an Answer to this Complaint [Doc. 5] and then filed an Amended Answer [Doc. 10], in which she asserts a counterclaim, alleging that Mr. Sherman's acts of withholding child support amounted to violations of the automatic stay and that she is entitled to actual and punitive damages as a result.

**Dischargeability under Section 523**

■ Section 727 of the Bankruptcy Code provides that the Court shall grant a debtor a discharge from all debts that arose prior to the debtor's Chapter 7 bankruptcy filing, except for certain types of debts listed in § 523. 11 U.S.C. § 727(b). This discharge is one of the primary benefits of filing bankruptcy for debtors, enabling them to get a "fresh start." But this fresh start is only available to the "honest but unfortunate debtor." *Grogan v. Garner*, 498 U.S. 279, 287, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991) (citation and quotations omitted).

■ Section 523 of the Bankruptcy Code provides a list of certain debts that are nondischargeable because the debtor was not simply honest and unfortunate but instead committed certain conduct that Congress has frowned upon. To prevent honest and unfortunate debtors from being ensnared by one of these exceptions, courts must construe them strictly in favor of the debtor. *United States v. Fretz (In re Fretz)*, 244 F.3d 1323, 1327 (11th Cir. 2001). And a plaintiff seeking to prove an exception to discharge has the burden of doing so by a preponderance of the evidence. *Grogan*, 498 U.S. at 287–88, 111 S.Ct. 654.

Here, Mr. Sherman primarily relies on two provisions of this section: Section 523(a)(2)—relating to debts obtained by fraud—and Section 523(a)(15)—relating to debts incurred in the course of a divorce or separation. He also seeks to continue with a lawsuit against Ms. Proyect in Paulding

County for breach of fiduciary duty, unjust enrichment, and theft by conversion.[5] For the reasons stated on the record at the conclusion of the trial, Mr. Sherman failed to carry his burden of proving nondischargeability under § 523(a)(2), and he failed to carry his burden of proving any of his state-law claims, let alone proving that they should be nondischargeable.[6] The Court also finds that the claims he asserts are not support and, therefore, are not within the scope of § 523(a)(5). The Court took his § 523(a)(15) claim related to her debt related to the Lease and the SBA Loan under advisement. The Court also took under advisement Ms. Proyect's claim that Mr. Sherman willfully violated the automatic stay.

### Section 523(a)(15): Nondischargeability of Debts Incurred in the Course of a Divorce

Congress added § 523(a)(15) to the Bankruptcy Code in 1994. The root of this section was H.R. 4711, which Representative Louise Slaughter introduced to remedy a variety of inequities she perceived in the treatment of support and property settlement obligations in bankruptcy following divorce, primarily to women and children. 1–6 COLLIER FAMILY LAW AND THE BANKRUPTCY CODE ¶ 6.07A; H.R. 4711, 103d Cong., 2d Sess. (1994). In response to concerns about the breadth of the newly proposed dischargeability exception, the language was changed so that the exception would be more narrowly tailored, and the new exception to discharge became law. 1–6 COLLIER FAMILY LAW AND THE BANKRUPTCY CODE ¶ 6.07A.

■ The enactment of this exception to discharge "expresses Congress's recognition that the economic protection of dependent spouses and children under state law is no longer accomplished solely through the traditional mechanism of sup-

5. By stipulation, the parties agreed and consented to the jurisdiction and authority of this Court to hear and resolve Mr. Sherman's state-law claims. *See* Consolidated Pre–Trial Order ¶ 4. [Doc. 19].

6. Among those reasons are that it appeared that Ms. Proyect used the money from liquidating business assets to pay business expenses (rather than personal expenses) and that Mr. Sherman had done the same; that no enforceable agreement was in place yet regarding how that money was to be spent (the relevant asset disposition took place in June and July 2012, but the Settlement Agreement did not become binding until the Divorce Decree was entered in November 2012); and that Mr. Sherman was aware of the Charge well before the Settlement Agreement was reached (in which he took responsibility for paying for it), yet he did not object to it until much later. Thus, Mr. Sherman failed to carry his burden of proving that he relied on any misrepresentation that Ms. Proyect made or that she intended to deceive him. With respect to the claim for breach of fiduciary duty, Mr. Sherman did not carry his burden of proving that Ms. Proyect was an officer or director of the Company. He alleged in his state court complaint that she was a shareholder of the Company, but he did not carry his burden of proving that fact (he produced no corporate records or tax returns), and the fact that he was entitled to claim all of the losses of the Company for tax purposes would seem to suggest otherwise. Furthermore, the Court finds that Ms. Proyect's valuation of the Spa's assets to be more credible than Mr. Sherman's valuation because the equipment was generally at least seven years old, whereas the values Mr. Sherman placed on the equipment were based on what it would cost to buy the equipment new. In addition, Ms. Proyect used the proceeds to pay for legitimate business expenses, which was an appropriate use, even if it was not what Mr. Sherman would have preferred. Also, to the extent any business information was lost, Mr. Sherman did not carry his burden of proving the loss was intentional or that the loss of information caused any damage to him. Finally, if Mr. Sherman was so concerned about the liquidation of the Spa's meager assets, he could have taken charge of the liquidation or at least been more involved, yet he chose not to do so.

port and alimony payments." *Gilman v. Golio (In re Golio)*, 393 B.R. 56, 61–62 (Bankr.E.D.N.Y.2008). Property settlement arrangements are often "important components of the protection afforded individuals who, during the marriage, depended on the debtor for their economic well-being." *Id.* (*quoting* 4 L. King, COLLIER ON BANKRUPTCY, ¶ 523.21 at 523–118 (15th ed. rev. 2008)). By enacting § 523(a)(15), Congress manifested its intent that "a debtor should not use the protection of a bankruptcy filing in order to avoid legitimate marital and child support obligations." H.R.Rep. No. 103–835, at 54 (Oct. 4, 1994), reprinted in 1994 U.S.C.C.A.N. 3340, 3363.

In 2005, Congress amended this section to clarify that this exception to discharge only applies to debts owed "to a spouse, former spouse or child of the debtor." [7] *Id.;* Pub.L. No. 109–8 (2005). Thus only these parties have standing to assert nondischargeability under § 523(a)(15).[8] Following this amendment, § 523(a)(15) now provides that § 727 does not discharge a debtor from any debt "to a spouse, former spouse, or child of the debtor and not of the kind described in [§ 523(a)(5) ] that is incurred by the debtor in the course of a divorce or separation or in connection with a separation agreement, divorce decree or other order of a

court of record." [9] 11 U.S.C. § 523(a)(15). Here, no evidence was presented that would suggest that Ms. Proyect's obligations to pay 50% of the SBA Loan and the Lease are of the kind described in § 523(a)(5); thus the questions before the Court are whether these obligations are owed to Mr. Sherman and whether they were incurred in the course of their divorce or in connection with the Settlement Agreement.

On first glance, one might think that a debt owed to a third party is by definition *not* owed to the former spouse, but some courts have found that a new debt to the spouse is created when the debtor takes on new responsibilities under a settlement agreement and when the former spouse has new enforcement rights following a divorce decree. A split of authority has developed, with some courts focusing on the presence or absence of indemnity or "hold harmless" language in the settlement agreement, and others focusing on the non-debtor spouse's rights under state law to enforce the terms of a divorce settlement agreement.

Some courts hold that when a settlement agreement and divorce decree contain no hold harmless language purporting to create a new obligation to indemnify the former spouse for amounts paid on account of

---

**7.** Congress also eliminated two additional elements that provided that a debt would nevertheless be dischargeable if the debtor does not have the ability to pay or the benefit of the discharge to the debtor outweighs the detriment to the nondebtor spouse.

**8.** Even before this amendment, courts routinely refused to allow third parties to make use of this exception, relying on Congressional intent. *See* H.R.Rep. No. 103–835, at 55 (1994), reprinted in 1994 U.S.C.C.A.N. 3340, 3364 ("If the debtor agrees to pay marital debts that were owed to third parties, those third parties do not have standing to assert this exception, since the obligations to them

were incurred prior to the divorce or separation agreement. It is only the obligation owed to the spouse or former spouse—an obligation to hold the spouse or former spouse harmless—which is within the scope of this section.").

**9.** This section also applies to debts incurred in connection with "a determination made in accordance with State or territorial law by a governmental unit." 11 U.S.C. § 523(a)(15). Also, this section does not apply to any debt "for a domestic support obligation." *See* 11 U.S.C. § 523(a)(5) (rendering those debts nondischargeable).

a debt to a third party, § 523(a)(15) does not apply because no new debt has been incurred, and the debtor's obligations related to the debt to the third party are thus dischargeable. *See, e.g., Stegall v. Stegall (In re Stegall)*, 188 B.R. 597 (Bankr.W.D.Mo.1995); *Belcher v. Owens (In re Owens)*, 191 B.R. 669 (Bankr. E.D.Ky.1996); *McCracken v. LaRue (In re LaRue)*, 204 B.R. 531 (Bankr.E.D.Tenn. 1997); *Salyers v. Richardson (In re Richardson)*, 212 B.R. 842 (Bankr.E.D.Ky. 1997); *Burton v. Burton (In re Burton)*, 242 B.R. 674 (Bankr.W.D.Mo.1999); *Mayes v. Mayes (In re Mayes)*, 455 B.R. 506 (Bankr.W.D.Va.2011). Conversely, courts following this reasoning conclude that when a settlement agreement *does* include hold harmless language, this language "creates a new indebtedness" to the former spouse, and thus § 523(a)(15) renders that debt nondischargeable. *Owens*, 191 B.R. at 673–74; *see also Cheatham v. Cheatham (In re Cheatham)*, 08–63664, 2009 WL 2827951 (Bankr.N.D.Ohio Sept. 2, 2009) (citations omitted) (recognizing that under Ohio law, "hold harmless language creates a new obligation from the party holding another harmless to the one held harmless"). These courts reason that when such language is included in a settlement agreement, should the nondebtor spouse face collection action from the third-party creditor, "the debtor would have to indemnify the ex-spouse pursuant to the hold harmless agreement, thus the creation of a 'new' debt to the spouse." *Burton*, 242 B.R. at 678. Other courts criticize this reasoning, asserting that the presence or absence of hold harmless language is not dispositive for purposes of § 523(a)(15). *See, e.g., Carlisle v. Carlisle (In re Carlisle)*, 205 B.R. 812, 818 (Bankr. W.D.La.1997) (asserting that Kentucky law does "not require talismanic 'hold harmless' language for divorce agreements to pay certain debts to be enforceable by a former spouse").

Even when no hold harmless language is present, some courts nevertheless conclude that § 523(a)(15) applies, focusing on the new state-law rights of an ex-spouse to enforce the terms of a divorce decree, including an obligation for the other to pay a third party. *See, e.g., Schmitt v. Eubanks (In re Schmitt)*, 197 B.R. 312 (Bankr.W.D.Ark.1996); *Johnston v. Henson (In re Henson)*, 197 B.R. 299 (Bankr. E.D.Ark.1996); *Carlisle v. Carlisle (In re Carlisle)*, 205 B.R. 812 (Bankr.W.D.La. 1997); *Gibson v. Gibson (In re Gibson)*, 219 B.R. 195 (6th Cir. BAP 1998); *Crawford v. Osborne (In re Osborne)*, 262 B.R. 435 (Bankr.E.D.Tenn.2001); *Burckhalter v. Burckhalter (In re Burckhalter)*, 389 B.R. 185 (Bankr.D.Colo.2008); *Wodark v. Wodark (In re Wodark)*, 425 B.R. 834 (10th Cir. BAP 2010); *Johns v. Washburn (In re Washburn)*, 09–80842–MHM, 2010 WL 4117680 (Bankr.N.D.Ga. Oct. 1, 2010); *Fisher v. Santry (In re Santry)*, 481 B.R. 824 (Bankr.N.D.Ga.2012). These courts typically reason that if "the former spouse has a right to compel performance, the debt is owed to her." *Washburn*, 2010 WL 4117680, at *2 (*citing Burckhalter*). These courts then identify state law that enables the former spouse to compel performance. *See, e.g., id.* (noting that under Georgia law, "a former spouse can enforce a debt created by a divorce decree by seeking a declaratory judgment against the debtor or filing a motion for contempt") (*citing* O.C.G.A § 9–4–2; O.C.G.A. § 15–1–4; and *Royal v. Royal*, 246 Ga. 229, 229, 271 S.E.2d 144 (1980)). Some of these cases go so far as to say that § 523(a)(15) does not require that the debt be paid directly to the former spouse. *See, e.g., Johnston v. Henson (In re Henson)*, 197 B.R. 299, 302–303 (Bankr. E.D.Ark.1996) ("The statute does not impose a 'direct pay' requirement."). But

most of these cases were decided before Congress amended § 523(a)(15) in 2005 to clarify that the relevant debt must be owed "to a spouse, former spouse or child of the debtor." 11 U.S.C. § 523(a)(15). Yet practical considerations may make it simpler to just pay the third party directly when the former spouse clearly has indemnification rights under state law. *See Cheatham*, 2009 WL 2827951, at *5 (concluding that "the mere fact that Defendant's debt is payable to [a third party] still does not mean that the debt is not 'to' Plaintiff within the meaning of the Bankruptcy Code"). In any event, the thrust of the reasoning underlying this line of cases is that a debt is nondischargeable when the debtor undertakes new obligations to pay on a debt for the former spouse's benefit and the former spouse can enforce those new obligations.

■ On the one hand, while the Court agrees that hold harmless language (which is not present here) may be an important factor indicating that a new debt to a former spouse may have arisen, such language alone may not be dispositive—instead applicable nonbankruptcy law should guide court decisions because other situations may exist where a debt arises by operation of law even without specific indemnification language in a settlement agreement. On the other hand, the Court also finds the latter line of cases problematic to the extent that they rely solely on state-law enforcement mechanisms of obligations under divorce decrees because the "fact that one spouse has a state remedy for the other spouse's failure to perform under a property settlement agreement does not change the fact that a debt for which a debtor has agreed to be responsible is still a debt owed to a [third-party] creditor." *Richardson*, 212 B.R. at 846. Naturally, every state has laws giving an ex-spouse the right to enforce the terms of a divorce decree, so the practical result of following the latter line of cases would be that every obligation between the ex-spouses to pay a debt to a third party recited in a divorce settlement agreement would be nondischargeable. This Court does not believe that Congress intended such a result. If Congress did have that intent, it could have simply provided that the exception to discharge applies to all debts addressed in a divorce settlement agreement rather than limiting the scope of the exception to debts "*incurred* by the debtor *in the course of* a divorce or separation *or in connection with* a separation agreement, divorce decree, or other order of a court of record." 11 U.S.C. § 523(a)(15) (emphasis added). As explained above, the purpose of § 523(a)(15) is to protect individuals who depended on the debtor during the marriage for their economic well-being and to prevent debtors from using the protection of a bankruptcy filing in order to avoid legitimate marital and child support obligations. Thus, rendering every obligation to be nondischargeable simply because it is mentioned in a divorce settlement agreement seems to go far beyond what Congress intended.

■ More importantly, the mere restatement of an existing obligation between the parties in a settlement agreement does not necessarily create new enforcement rights—and thus a new debt—that did not already exist. The crucial question is: what were the relative rights and obligations of the debtor and the former spouse before and after the divorce?

■ Under Georgia law, a joint obligor who has paid more than his share of a joint debt is entitled to contribution from the other obligor and may pursue legal and equitable actions to enforce his contribution rights. O.C.G.A. § 23–2–71. Par-

ticularly, when the relevant parties are "sureties for the same principal for the same sum of money ... and one pays more than an equal share of the sum, he may compel contribution from his cosureties." O.C.G.A. § 10–7–50. And the proper measure of contribution under Georgia law is the amount owed to the third party divided by number of persons subject to the judgment. *Gerschick v. Pounds*, 262 Ga.App. 554, 586 S.E.2d 22 (2003), *overruled on other grounds by VATACS Grp., Inc. v. HomeSide Lending, Inc.*, 281 Ga. 50, 635 S.E.2d 758 (2006).

■ Here, both Mr. Sherman and Ms. Proyect were sureties for the Company on obligations under the Lease and the SBA Loan. Even if the Settlement Agreement had never materialized and the Divorce Decree had never been entered, Mr. Sherman would still have had a right to pursue a contribution action against Ms. Proyect for 50% of any amount he paid toward the Lease or the SBA Loan. Following entry of the Divorce Decree, he still had the right to compel Ms. Proyect to pay 50% of these debts—no more and no less than before—therefore the Divorce Decree changed nothing with regard to his state law rights to seek contribution or indemnity from her. No new rights arose; thus no new debts were created. The relevant debts were created when Mr. Sherman and Ms. Proyect agreed to be bound by the Lease and the SBA Loan, and their relative rights and obligations relating to those debts did not change. Accordingly, Ms. Proyect's obligations to Mr. Sherman related to the Lease and the SBA Loan were not "incurred by the debtor in the course of a divorce or separation or in connection with a separation agreement, divorce decree or other order of a court of record." 11 U.S.C. § 523(a)(15). As a result, § 523(a)(15) does not apply, and

these debts are thus dischargeable pursuant to § 727.

## Debtor's Counterclaim for Violation of Stay

Now the Court turns to Ms. Proyect's counterclaim against Mr. Sherman for allegedly violating the automatic stay. Section 362(a) of the Bankruptcy Code provides that the filing of a bankruptcy petition operates as a stay of, among other things, "the setoff of any debt owing to the debtor that arose before the commencement of the case under this title against any claim against the debtor." 11 U.S.C. § 362(a)(7). And Section 362(k) provides that "an individual injured by any willful violation of a stay provided by this section shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages." 11 U.S.C. § 362(k).

■ Ms. Proyect argues that Mr. Sherman willfully violated the stay by withholding a portion of his child support payments to offset her share of payments he made under the Lease Settlement. At trial, Mr. Sherman's attorney argued that the stay did not apply and that Mr. Sherman was entitled to offset Ms. Proyect's share of the Lease Settlement payments against his child support payments primarily because his obligation to pay child support did not arise until after the commencement of the underlying bankruptcy case.

■ The Court disagrees with Mr. Sherman and finds that he was not entitled to perform this setoff for two reasons. First, generally under Georgia law, "due to the unique nature of the support obligation, a spouse obligated to pay support is not entitled to a set off." *Baer v. Baer*, 263 Ga. 574, 575, 436 S.E.2d 6, 7 (1993) (citations omitted). "However, equitable considerations can apply to permit set

offs." *Id.* (citations omitted). The Court does not find that any such equitable considerations are present here; thus Mr. Sherman was not entitled to a setoff. Second, as explained above, Ms. Proyect's obligations under the Lease are dischargeable under § 727, and she has in fact received a discharge in the underlying bankruptcy case. Since Ms. Proyect is no longer liable for amounts owed on the Lease, Mr. Sherman does not have a claim against her to set off against his child support payments.

Accordingly, the Court finds that Mr. Sherman's actions of withholding child support—even after being informed that his actions may be a violation of the automatic stay and without ever moving to have the stay lifted—amount to willful violations of the automatic stay. As a result, Ms. Proyect is entitled to recover the amounts that he withheld. However, the Court does not find that punitive damages are appropriate under the circumstances of this case.

### Conclusion

For the reasons stated above, it is hereby

ORDERED that the portions of the Complaint seeking nondischargeability and damages from Ms. Proyect under 11 U.S.C. § 523(a)(2) are DISMISSED; it is further

ORDERED that those portions of the Complaint seeking nondischargeability of Ms. Proyect's liability to Mr. Sherman on account of the Lease and the SBA Loan under 11 U.S.C. § 523(a)(5) and § 523(a)(15) are DISMISSED; it is further

ORDERED that Mr. Sherman's claims under Georgia law for breach of fiduciary duty, unjust enrichment, and theft by conversion, and that those claims should be non-dischargeable, are DISMISSED; it is further

ORDERED that Mr. Sherman shall pay to Ms. Proyect all child support withheld from her, but Ms. Proyect's claim for punitive damages is DENIED. If the parties cannot agree on the amount that was withheld, the Superior Court of Paulding County is authorized to determine that amount, or the parties may return to this Court for a determination of such damages.